This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, The B.F. Goodrich Company ("Goodrich"), appeals from a judgment of the Summit County Court of Common Pleas that granted summary judgment to several defendant insurers on the issue of coverage ("the excess insurers")[1]. We reverse and remand.
{¶ 2} On February 2, 1999, Goodrich filed a complaint against several insurance carriers with whom it had held umbrella and excess liability insurance policies from 1955 through 1986. In addition to claims for breach of contract and bad faith, Goodrich sought a declaration that each of these insurers had a duty to defend and/or indemnify it against claims filed by the federal government under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") and the Resource Conservation and Recovery Act ("RCRA"). The environmental claims stemmed from soil and groundwater contamination caused by Goodrich's prior waste water disposal practices at its manufacturing facility in Calvert City, Kentucky.
{¶ 3} Goodrich notified most of its excess insurers about its potential environmental liability at its Calvert City site during June of 1989. One defense to coverage raised by many of the excess insurers was that Goodrich's notice to them was unreasonably late. They claimed that Goodrich knew at a much earlier date, and thus had a duty to notify them then, that its environmental liability at this site would exceed the coverage limits of its primary insurance policies. According to Goodrich, it was not until 1989 that it estimated its liability for government-required cleanup to total approximately $17 million. The excess insurers, however, maintained that Goodrich knew during the early to mid-1980s that its environmental liability at the site would exhaust its primary insurance coverage and that, therefore, its notice to them was unreasonably late. The excess insurers moved for summary judgment on that ground as well as others.
{¶ 4} The trial court granted summary judgment to the excess insurers, finding that Goodrich's notice to them was unreasonably late. Goodrich appeals, raising three assignments of error.
 First Assignment of Error {¶ 5} "THE TRIAL COURT INCORRECTLY GRANTED SUMMARY JUDGMENT ON CLAIMED LATE NOTICE."
{¶ 6} As its first assignment of error, Goodrich contends that the trial court erred in granting summary judgment to the excess insurers. Pursuant to Civ.R. 56(C), summary judgment is proper if:
 {¶ 7} "(1) [N]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party." State ex. rel. Howard v. Ferreri (1994), 70 Ohio St.3d 587, 589.
{¶ 8} Doubts must be resolved in favor of the nonmoving party.Horton v. Harwick Chem. Corp. (1995), 73 Ohio St.3d 679, 686. A party moving for summary judgment bears an initial burden of pointing to "someevidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates that the nonmoving party has no evidence to support the nonmoving party's claims." Dresher v. Burt (1996), 75 Ohio St.3d 280,293. (Emphasis sic.) When a moving party has met this initial burden, the nonmoving party "may not rest on the mere allegations of her pleading, but [its] response * * * must set forth specific facts showing the existence of a genuine triable issue." State ex rel. Burnes v. AthensCty. Clerk of Courts (1998), 83 Ohio St.3d 523, 524.
{¶ 9} All evidence must be construed in favor of nonmovant. In ruling on a motion for summary judgment the trial court is not permitted to weigh the evidence or choose among reasonable inferences. Dupler v.Mansfield Journal Co. (1980), 64 Ohio St.2d 116, 121. Rather, the court must evaluate the evidence, taking all permissible inferences and resolving questions of credibility in favor of the non-moving party. Id.
{¶ 10} The excess insurers separately moved for summary judgment. Commercial Union Insurance Company filed the primary motion, asserting that Goodrich had no coverage under the applicable policies for several reasons: (1) Goodrich's notice to the excess insurers was unreasonably late; (2) the known loss doctrine prevented recovery; (3) there was no "occurrence" under the policies because Goodrich expected the damage to occur; (4) a pollution exclusion in some of the policies prevented recovery; and (5) Goodrich's bad faith claim failed as a matter of law because the insurers had a reasonable justification for denying coverage to Goodrich. Several of the other excess insurers joined in this motion in whole or in part.[2]
{¶ 11} Because the trial court disposed of the motion on the issue of late notice, we will begin by addressing that ground. Proper notice is a condition precedent to insurance coverage. See American Emp. Ins. v.Metro Reg. Transit Auth. (C.A.6, 1993), 12 F.3d 591, 595, citingKornhauser v. National Surety Co. (1926), 114 Ohio St. 24, paragraph three of the syllabus.
{¶ 12} The policies at issue in this case required Goodrich to promptly notify each excess insurer when it had information from which it could reasonably conclude that coverage under the excess policies would be triggered. In other words, it had a duty to promptly notify these insurers when it reasonably believed that its environmental liability would exhaust its coverage under its primary insurance policies.
{¶ 13} It is also important to note that the policies at issue are excess insurance policies. Although the trial court found that the distinction between primary and excess policies was immaterial to the analysis of this issue, we disagree. The holder of a primary insurance policy typically has the duty to notify its insurer as soon as it realizes that it is liable for any environmental cleanup and remediation costs. An insured's duty to notify its excess insurance carrier, on the other hand, is not triggered until the insured has reason to believe that its environmental liability will exhaust its coverage under its primary policies. It must have knowledge not only of potential liability but it must also have reason to believe that the extent of its liability will exceed the coverage limits of its primary insurance policy.
{¶ 14} In Ormet Primary Aluminum Corp. v. Employers Ins. ofWausau (2000), 88 Ohio St.3d 292, 300, the Ohio Supreme Court held that, although the question of late notice is usually a question for the jury, "an unexcused significant delay may be unreasonable as a matter of law." Id. at 300. In Goodyear Tire Rubber Co. v. Aetna Casualty Surety Co. (2002), 95 Ohio St.3d 512, 2002 Ohio 2842, the Ohio Supreme Court reversed the decision of this court that affirmed a directed verdict for the insurers on the issue of late notice. The Supreme Court again stressed that this issue is typically one for the jury, noting that "[i]nformation and events were unfolding over time with such complexity that only the factfinder may resolve the issue of whether Goodyear's notice was unreasonable." Id. at 518, 2002 Ohio 2842, at ¶ 17.
{¶ 15} The primary motion for summary judgment, in which most of the other excess insurers joined, was filed by Commercial Union Insurance Company. It argued that Goodrich first notified its excess insurers in June of 1989. It contended that Goodrich knew years earlier that it would be responsible for environmental cleanup at Calvert City and that its liability would exceed $20 million, the attachment point of the Commercial Union policies.[3] The excess insurers contended that the "undisputed evidence" established that Goodrich's duty to notify its excess insurers about its environmental liability at Calvert City was triggered at least five years before it issued notice, a delay which, according to the excess insurers, was unreasonable as a matter of law. They pointed to evidence to establish that Goodrich had known since the mid-1960s that it had been contaminating the groundwater at Calvert City and that it knew by the early 1980s that it would be held liable for remediation and that its potential liability for cleanup costs would exhaust its primary insurance coverage.
 The Excess Insurers' Evidence
{¶ 16} To establish that Goodrich had long known that its environmental liability at Calvert City would exceed $20 million, the excess insurers pointed to evidence that included the following.
 1960s
{¶ 17} The testimony of several different witnesses who were employed at the facility during the 1960s revealed the following facts. These employees were aware that the facility's well water was contaminated with ethylene dichloride (EDC) during the early to mid-1960s because, according to one witness, that is what he was told. Other witnesses testified that the well water either smelled or tasted of EDC and that the plant switched to bottled water and then to the city water supply as alternative sources of drinking water. The plant manager during that period testified that he was aware then that chlorinated hydrocarbons were seeping into the groundwater.
{¶ 18} Goodrich internal memoranda discussed the results of tests on the wells. The tests had revealed the presence of chlorinated hydrocarbons and other chemicals in the groundwater under the plant, suggesting that these chemicals had seeped from one or more of the storage ponds. The authors of the memoranda expressed concern about groundwater contamination and discussed whether and how Goodrich should take measures to prevent the seepage.
 1970s
{¶ 19} Goodrich internal reports and memoranda generated during the 1970s discussed the problems with the high presence of EDC, oil, and heavy metals in the ponds and the fact that the ponds were leeching contaminants into the groundwater under the facility.
{¶ 20} One witness agreed that the term "boiling cauldron" described the condition of one storage pond during the early to mid-1970s. He also agreed that offensive fumes came from the ponds. He described one incident in which a duck landed on the pond and "it ate his feet off." He explained that, although this became a story that traveled throughout the plant, he personally observed it and helped to pull the duck from the pond.
 1980s
{¶ 21} During the early 1980s, internal memoranda and reports were generated by Goodrich that indicated that Goodrich was aware at that time that, pursuant to RCRA, the government might require it to clean up the contamination from the storage ponds and that continued operation of the ponds could be costly. The memoranda, noting Goodrich's uncertainty about what the government would require it to do, explored different options that Goodrich might pursue to minimize its costs. Goodrich was aware that Kentucky state law prohibited pollution of the groundwater and that the "[p]resence of chemicals in groundwater at Calvert City plant could be interpreted as violation of present Kentucky Environmental Control laws[.]" These documents further indicated that Goodrich was aware that federal superfund reporting requirements would also apply to the Calvert City underground water quality.
 Estimated Liability
{¶ 22} A 1980 Goodrich internal memorandum estimated the cost of cleaning up and closing the storage ponds at $27 million. In 1981, Goodrich estimated the cost at somewhere between $27 million and $33 million. During 1982, Goodrich was notified by the state of Kentucky that its Calvert City site was a potential candidate for the CERCLA national priority list and, in 1982, the site was placed on the national priority list.
{¶ 23} During the mid-1980s, Goodrich was designated a potentially responsible party under CERCLA. In November 1985, Goodrich entered into an Administrative Order on Consent with the United States Environmental Protection Agency, in which it agreed to pay for the cleanup of the Calvert City site. Goodrich closed the storage ponds during the late 1980s. On July 18, 1988, Goodrich executed a consent decree with the USEPA in which it agreed to clean up the site.
{¶ 24} By the time Goodrich notified its excess insurers in 1989, it had spent nearly $23 million at the Calvert City site. Goodrich's 1989 notice to its excess insurers, however, indicated that, at that time, it estimated its cleanup costs to be approximately $17.5 million, which it characterized as a liberal or high estimate of the costs.
 Goodrich's Evidence
{¶ 25} In opposition to summary judgment, Goodrich argued, among other things, that there were genuine issues of material fact on the notice issue. It pointed to evidence that, detail by detail, contradicted much of the evidence submitted by the excess insurers. Its evidence included the following.
 1960s
{¶ 26} The former plant environmental engineer testified that, although Goodrich did switch the water supply for the Calvert City facility from wells to the Tennessee River and eventually to the city water supply, the change was not due to any concern that the groundwater was contaminated with EDC. Another witness, the plant manager at that time, explained that the water source was switched because the wells, and then the river, could not produce sufficient capacity to meet Goodrich's needs.
{¶ 27} During the time that the supply came from the river, changes in the direction of the flow of the river could affect the taste of the water until the river resumed its normal flow. The plant supplied coolers of city water for drinking during those periods. The former plant manager testified that he did not recall smelling or tasting EDC in the water at the plant.
{¶ 28} The former plant environmental engineer explained that during 1967, Goodrich sampled the groundwater at the facility. Although the presence of EDC was detected, it was not believed to be at a dangerous level and Goodrich believed that it was in compliance with all state and federal laws. He further attested that the groundwater under the Calvert City facility was not a source of drinking water for anyone.
 1970s
{¶ 29} The fact that one of the storage ponds was described as a "boiling cauldron" was explained by one of Goodrich's witnesses. During the mid-1970s, Goodrich used an emergency shutdown system for one of the plants. During such a shutdown, gases from the plant were vented into one of the storage ponds. During this process, the pond would appear to bubble and boil.
{¶ 30} That same witnesses testified that "[i]t is simply untrue that a duck landed on the pond at Goodrich's Calvert City and the duck's feet were burned off due to the chemicals in the pond. In reality, there were occasions where ducks nested near the ponds and the snapping turtles which lived in the ponds ate ducklings and bit the ducks' legs when they were in the pond."
{¶ 31} In 1977, the state of Kentucky asked industry to participate in a well drilling program to test the integrity of earthen ponds as a method for treatment of industrial wastewater. Goodrich began drilling of monitoring wells in 1978 and sent its monitoring data to the state. The data showed the presence of some contaminants in the groundwater. Goodrich hired a consultant to conduct a hydrological study. The consultant found that, although some substances had apparently seeped from the ponds, there was no danger of the substances migrating into the public water supply.
 1980s
{¶ 32} The former plant manager testified that, in 1984, RCRA was enacted. Among other things, RCRA would require Goodrich to either modify its existing storage ponds to continue to operate them or it would have to close them. Goodrich weighed the costs associated with each alternative and decided that it would be too expensive to continue to operate the storage ponds, so it decided to close them.
 Estimated Liability
{¶ 33} Exhibit by exhibit, the former plant engineer explained the cost figures from the early 1980s to which the excess insurers pointed as evidence that Goodrich had projected the Calvert City cleanup costs to exceed $20 million. He testified that the figures in excess of $20 million "do not in any way relate to remediation costs claims being pursued in this action, but, rather, relate solely to costs incurred by Goodrich as costs of doing business under RCRA regulations relating to the continued operation or closure of the [ponds]." These figures included approximately $15 million dollars in pond closure costs, which were totally unrelated to any groundwater remediation that Goodrich was required to take.
{¶ 34} Another former Goodrich employee, a financial analyst in its risk management department, testified that, at the time Goodrich was incurring the pond closure costs, she did not believe that these were the types of expenses "that would give rise to an insurance claim because Goodrich was undertaking this work under RCRA regulations, not as a result of any governmental cleanup or enforcement action or any other claim being made against Goodrich." The witness further explained that if the risk management department had become aware of any third party claims, it would have promptly notified its general liability insurers.
{¶ 35} According to the vice president and counsel of Risk International Services, Inc., which functioned as Goodrich's insurance department, it was not until June and November of 1989 that Goodrich realized that its liability at Calvert City would exceed $17 million.
 Conclusion on Late Notice Issue
{¶ 36} As indicated above, the material facts on this issue were sharply in dispute. At the heart of the notice issue is when Goodrich realized that its environmental liability would exhaust its primary insurance coverage. The dollar estimates presented through Goodrich documentation by the excess insurers were explained by Goodrich witnesses to improperly include approximately $15 million in pond closure costs. Goodrich witnesses explained that Goodrich was not currently seeking insurance coverage for the pond closure costs nor did its risk management department ever believe that it could.
{¶ 37} In a purported attempt to demonstrate an absence of dispute on this material fact, the excess insurers submitted reply briefs and pointed to additional evidence. Specifically, the excess insurers presented evidence that suggested that Goodrich apparently believed at one time that it could recover pond closure costs from its insurers. Although the parties disputed below and again on appeal whether the trial court should have considered this evidence, we need not answer that question. This rebuttal evidence, even if it could be properly considered by the trial court, served only to further demonstrate that this particular material fact was disputed. The trial court, however, assigned greater weight to the rebuttal evidence and, in effect, used it to completely discount the fact testimony of some of Goodrich's witnesses.[4]
Evidence must be construed in favor of the nonmovant and it is impermissible on summary judgment for the trial court to weigh the evidence or pass on its credibility. See Dupler, supra. The material facts on this issue were disputed and summary judgment was not proper.
 Alternative Grounds for Summary Judgment
{¶ 38} Although the trial court erred in granting summary judgment on the ground of late notice, because the excess insurers raised additional grounds for summary judgment, we would typically review the other grounds and affirm summary judgment if any of the other grounds supported it. See McKay v. Cutlip (1992), 80 Ohio App.3d 487, 491. Goodrich contends, however, that we should not address the other grounds raised by the excess insurers because the trial court did not. Among the authorities it cites is Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356.
{¶ 39} In Murphy, the Supreme Court held that the trial court committed reversible error when it stated on the record that it had not reviewed the summary judgment materials submitted by the parties and then proceeded to issue its ruling without allowing any time within which to conduct such a review. The Murphy court held, in its syllabus:
 {¶ 40} "Civ.R. 56(C) places a mandatory duty on the trial court to thoroughly examine all appropriate materials filed by the parties before ruling on a motion for summary judgment. The failure of a trial court to comply with this requirement constitutes reversible error." 65 Ohio St.3d 356, at syllabus.
{¶ 41} The Murphy court stressed that, although an appellate court conducts a de novo review of summary judgment, it is nonetheless areview of what happened in the trial court. "A reviewing court, even though it must conduct its own examination of the record, has a different focus than the trial court. If the trial court does not consider all the evidence before it, an appellate court does not sit as a reviewing court, but, in effect, becomes a trial court." Id. at 360.
{¶ 42} Faced with appellants arguing reversible error underMurphy, most appellate courts have applied a basic presumption of regularity in the proceedings below. In other words, absent an affirmative demonstration on the record that the trial court failed to review all of the summary judgment materials before it, an appellate court will presume that it did. See, e.g., Montgomery v. John Doe 26 (2000), 141 Ohio App.3d 242; Sadi v. Alkhatib (Aug. 28, 2001), 10th Dist. No. 01AP-125; Reagan v. Ranger Transp., Inc. (Aug. 9, 1996), 11th Dist. Nos. 95-P-0123 and 95-P-0124; McNeil v. Case Western Reserve Univ.
(Aug. 7, 1995), 8th Dist. No. 67651.
{¶ 43} On the other hand, where the record affirmatively demonstrates a failure by the trial court to fully consider summary judgment materials submitted by the parties, appellate courts have reversed and remanded the cause to the trial court for a proper Civ.R. 56 summary judgment examination. See, e.g, Swymn v. Owners Ins. Co., Inc.
(Apr. 7, 1999), 4th Dist. No. 98CA2582; Kerr-Morris v. Ramada Hotel Mgt.
(Apr. 23, 1999), 1st Dist. No. C-980625; Wissel v. McDonalds Corp. (Jan. 21, 1998), 9th Dist. No. 2702-M; Norwalk v. Cochran (Dec. 29, 1995), 6th Dist. No. H-94-040.
{¶ 44} In this case, although the trial court stated near the conclusion of its order that it would not consider the excess insurers' alternative arguments for summary judgment because they were moot, it had indicated earlier in its order that it was considering only the issue of late notice and not the other grounds raised for summary judgment by the excess insurers. Specifically, two of the defendant insurers who moved for summary judgment had raised the alternative grounds raised by the other insurers (known loss, no occurrence, and pollution exclusion) but had not raised the issue of late notice. The trial court explicitly indicated in a footnote that these insurers remained parties in the case because they "did not make arguments with respect to late notice." Although the portion of the order denying the summary judgment motions of those two insurers is not final and appealable and is not subject to appellate review at this time, the court's statement serves as an affirmative demonstration that the trial court did not consider any of the alternate grounds for summary judgment raised by the excess insurers. That abrogation of its duty under Civ.R. 56 constituted reversible error. The first assignment of error is sustained.
 Second Assignment of Error {¶ 45} "THE TRIAL COURT INCORRECTLY DENIED GOODRICH'S MOTION TO STRIKE DEFENDANT'S REPLY BRIEFS OR, IN THE ALTERNATIVE, TO FILE A SURREPLY."
 Third Assignment of Error {¶ 46} "GOODRICH NEED NOT PREVAIL ON ITS COVERAGE CLAIMS TO HAVE AN ACTIONABLE CLAIM FOR BAD FAITH."
{¶ 47} Because the second and third assignments of error have been rendered moot by our disposition of the first assignment of error, they will not be addressed. App.R. 12(A)(1)(c).
BAIRD, P.J., CARR, J. CONCUR.
[1] Although there are other excess insurers in this case, for ease of discussion, we will use the term "the excess insurers" to refer only to the appellees in this case, the excess insurers who were granted summary judgment, and will confine our discussion to those insurers.
[2] Rather than discussing each and every problem with the multiple motions that were filed, for ease of discussion, we will focus on the basic issue in summary judgment, whether the excess insurers established that there was no genuine issue of material fact on the issue of late notice. There are many other problems that, although not specifically addresssed, have not gone unnoticed. For example, some of the insurers failed to meet their burden under Dresher to point to supporting evidence (the policy's notice provision, the attachment point of the policy, when Goodrich gave notice, etc.) and some who were granted summary judgment on this ground failed to even articulate any independent argument on this issue.
[3] On appeal, the parties have refined their arguments to address the differing attachment points of the various excess policies. Because these arguments were not articulated below, nor were they considered by the trial court, this court will not address them on appeal. Although this court conducts a de novo review of summary judgment, that review is limited to the arguments and evidence that the parties presented to the trial court. See Chester Properties, Inc. v. Hoffman (Oct. 26, 2001), 11th Dist. Nos. 2001-G-2333 and 2001-G-2334.
[4] The trial court found Goodrich's "argument" that it was not seeking insurance coverage for its pond closure costs to be "completely without merit." It then proceeded to recount the documentary evidence that was favorable to the excess insurers on this issue, but completely ignored the relevant testimony presented by Goodrich. Clearly, a genuine dispute as to material facts exists as to this issue.